312 P.3d 869

Michael SIOPES and Lacey Siopes,
Petitioners/Plaintiffs–
Appellants,

v.

KAISER FOUNDATION HEALTH PLAN,
INC.; Hawai'i Permanente Medical
Group, Inc.; Kaiser Foundation Hospi-
tals, Inc., Respondents/Defendants–Ap-
pellees.

No. SCAP–12–0000361.

Supreme Court of Hawai'i.

Sept. 26, 2013.

As Corrected Sept. 26, 2013.

Mark Davis, Michael K. Livingston, Matthew C. Winter, Clare E. Connors, Honolulu, for petitioners.

William S. Hunt, Dianne Winter Brookins, Jan M. Vernon, David A. Abadir, Honolulu, for respondents.

RECKTENWALD, C.J., NAKAYAMA, ACOBA, and POLLACK, JJ., with ACOBA, J., concurring separately, and McKENNA, J., concurring separately.

**Opinion of the Court by POLLACK, J.**

Petitioners Michael Siopes and Lacey Siopes (collectively, "Siopeses") appeal from the Circuit Court of the First Circuit's (circuit court) March 5, 2012 orders granting the Motion to Compel Arbitration (Motion to Compel Arbitration) and the Motion to Stay Discovery and Other Pretrial Proceedings Pending a Ruling on the Motion to Compel Arbitration (Motion to Stay Discovery), filed by Respondents Kaiser Foundation Health Plan, Inc., Hawai'i Permanente Medical Group, Inc., and Kaiser Foundation Hospitals, Inc. (collectively, "Kaiser").

For the reasons set forth herein, we hold that the arbitration provision contained in the relevant contract is unenforceable based on the lack of an underlying agreement between Kaiser and Michael to arbitrate. Accordingly, Lacey is also not bound to arbitrate her claims in this case. The circuit court's orders are vacated and the case is remanded for further proceedings consistent with this opinion.

### I.

### A.

In 1998, Michael began working as a full-time teacher at a public school on Maui. Michael was presented with options for health insurance coverage through the Department of Education and the Hawai'i State Teachers Association. The Hawai'i Employer—Union Health Benefits Trust Fund (EUTF) "was established to provide a single health benefits delivery system for State and county employees, retirees, and their dependents." [1] *Awakuni v. Awana,* 115 Hawai'i

---

1. The EUTF replaced the Hawai'i Public Employees Health Fund on July 1, 2003. *Awakuni,* 115 Hawai'i at 130, 165 P.3d at 1031. The EUTF is administered by a board of ten trustees, all appointed by the governor, five of whom represent the employee-beneficiaries and five who represent the public employers. HRS § 87A–5 (2012).

HRS § 87A–16 (2012) provides that "[t]he board shall establish the health benefits plan or plans" and "may contract for health benefits plans or provide health benefits through a noninsured schedule of benefits." "Health benefits plan" is defined to include "[a] group insurance contract or service agreement that may include medical, hospital, surgical, prescribed drugs, vision, and dental services, in which a carrier agrees to provide, pay for, arrange for, or reimburse the cost of the services as determined by the board[.]" HRS § 87A–1 (2012).

126, 129, 165 P.3d 1027, 1030 (2007). *See* Hawaiʻi Revised Statutes (HRS) Chapter 87A.

On May 26, 2003, Michael signed a one-page enrollment form entitled "EUTF Enrollment/Change Form for Active Employees" (Enrollment Form), enrolling in a Kaiser health plan offered through the EUTF.

In a section entitled "Premium Conversion Plan Elections," Michael selected a box providing:

> ENROLL me in the Premium Conversion Plan (PCP) so that my monthly contribution for my health insurance benefit plans premiums will be paid using pre-tax payroll deducted monies, to the extent permitted. I have read and understand the PCP information provided in the <u>instruction sheet.</u>

(Emphasis added). The record does not include an instruction sheet or any evidence that an instruction sheet was provided to Michael.

Michael indicated that he was "Single" on the Enrollment Form and did not provide any information in the dependent coverage section of the form with respect to dependents to include in his selected plan. Lacey, who is presently married to Michael, has never been a Kaiser member. She did not sign the Enrollment Form.

At the bottom of the Enrollment Form, a signature box provides that the enrollee, by signing the Enrollment Form, makes the following certifications and affirmations[2]:

> Certification: I certify that the information provided in this application is true and complete. I agree to abide by the terms and conditions of the benefit plans I selected. I authorize my employer or finance officer to set my effective dates of coverage and to make the pre-tax or after-tax deductions, adjustments or cancellations from my salary, wages, pension or other compensation for my monthly employee contribution in accordance with applicable laws, rules or regulations.
>
> I affirm that any listed dependent child, aged 19 through 23, is attending a college, university or technical school as a full-time student.
>
> I affirm that I have non-EUTF plan benefits for each Dual Coverage Plan I selected.

The Enrollment Form does not provide any other description or identification of what is referred to as the "terms and conditions of the benefit plans I selected"; nor does the Enrollment Form provide that the "terms and conditions" are stated in a separate document.

According to Kaiser, a 2003 Group Medical and Hospital Service Agreement (Group Agreement) entered into between Kaiser and the EUTF was applicable to Michael when he signed the Enrollment Form. However, the 2003 Group Agreement was not attached to the Enrollment Form or given to Michael prior to his signing the Enrollment Form. There is also no indication in the record that the agreement was subsequently provided to Michael. Additionally, the Enrollment Form itself contains no reference by name to a "Group Medical and Hospital Service Agreement" or to any agreement between Kaiser and the EUTF. The form also does not provide a space for the enrollee to acknowledge whether he or she has read and understood the Group Agreement, including the "terms and conditions" of the applicable benefit plan.

The 2003 Group Agreement that Kaiser states was applicable does not contain a section specifically titled "Terms and Conditions." In addition, the Group Agreement does not contain a signature line for a prospective or current Kaiser member to acknowledge that it was read or received prior to or after enrollment in the Kaiser plan.

Under a section entitled "Relations Among Parties Affected by Service Agreement," the Group Agreement provides that Kaiser members "authorize" the EUTF "for purposes of entering into this Service Agreement and for all other purposes in regards to this Service Agreement," although the provision does not explain what is meant by "all other purposes." Additionally, this section provides

---

**2.** The affirmations appear to have no applicability to Michael.

that "[a]ny notice to Group by Health Plan is deemed notice to the Members."[3]

A section entitled "Miscellaneous Provisions" includes a subsection titled "Service Agreement Binding on Members." The subsection provides: "By electing medical and hospital coverage pursuant to this Service Agreement, or accepting benefits hereunder, all Members legally capable of contracting, and the legal representatives of all Members incapable of contracting, agree to all terms, conditions and provisions of this Service Agreement."

Section 8 of the 2003 Group Agreement is entitled "Appeal and Arbitration Procedures" and begins on page 10 of the agreement. The arbitration section is titled and set forth in the same font as all other provisions in the agreement and is not otherwise distinguished from the other provisions. The arbitration provision states that it governs all claims "arising from an alleged violation of a legal duty incident to this Service Agreement" that are brought by a Kaiser member or representative against a Kaiser entity.[4]

This section on the scope of the arbitration clause also provides that "[b]enefit-related claims subject to Chapter 502(a)(1)(B) of the Employee Retirement Income Security Act (ERISA) are covered by this binding arbitration requirement," unless exempted by satisfying two conditions.[5]

The arbitration provision limits the scope of civil discovery to "relevant" documents, "brief depositions," and "independent medical evaluations," with the arbitrator designated to resolve any disputes:

Limited civil discovery shall be permitted for (1) production of relevant documents, (2) taking of brief depositions of parties and expert witnesses, and (3) independent medical evaluations. The arbitrator(s) shall resolve any discovery dispute submitted by any party.

3.   The section provides in its entirety:
     **B.   Group as Agent for Members.**  By requesting and accepting membership under the Group's Service Agreement with Health Plan, Members authorize Group for purposes of entering into this Service Agreement and for all other purposes in regards to this Service Agreement.
     Any notice to Group by Health Plan is deemed notice to the Members.
The Group Agreement provides in a separate section that "Member" means "Any Subscriber or Family Dependent." "Group" is defined as "[t]he organization identified as the Group on the Face Sheet of this Service Agreement, including all Subscribers and Family Dependents who are part of Group's Service Agreement with Health Plan." Kaiser states that the EUTF is the "Group." "Health Plan" means "Kaiser Foundation Health Plan, Inc., Hawai'i Region, a California nonprofit corporation."

4.   The arbitration provision provides in relevant part:
     **B.   Binding Arbitration.**  Any claim arising from an alleged violation of a legal duty incident to this Service Agreement shall be submitted by the Member to binding arbitration if the claim is asserted:
     (1) By a Member . . . or by any other person entitled to bring an action for damages for harm to the Member as permitted by Hawai'i state law existing at the time the claim is filed . . .;
     (2) On account of death, bodily injury, physical ailment, mental disturbance, or economic loss arising out of the rendering or failure to render services or the provision or failure to provide benefits under this Service Agreement, or arising out of any other claim, irrespective of the legal theory upon which the claim is asserted;
     (3) For monetary damages exceeding the jurisdictional limit of the Small Claims Division of the District Court of the State of Hawai'i for claims . . .; and
     (4) Against one or more of the following entities or their employees, officers or directors ("Respondent"):
     (i) Kaiser Foundation Health Plan, Inc.,
     (ii) Kaiser Foundation Hospitals,
     (iii) Hawai'i Permanente Medical Group, Inc.,
     (iv) The Permanente Federation, LLC,
     (v) The Permanente Company, LLC,
     (vi) Any individual or organization that contracts with an organization named in (i), (ii), (iii), (iv) or (v) above to provide services to Health Plan Members, when such contract includes a provision requiring arbitration of a claim of a Health Plan Member.
(Emphases added).

5.   The conditions for exemption provide that the above claims are covered by the arbitration clause unless: "(a) the U.S. Department of Labor Regulation in 29 C.F.R. Chapter 2560.503–1(c)(4) applies to prohibit mandatory binding arbitration of the category of claim presented; and (b) that Regulation has not been modified, amended, repealed, superceded, or otherwise found to be invalid or inapplicable to such claims."

In regard to arbitration fees, the arbitration provision requires that "fees and expenses of the arbitration service and the arbitrator(s) shall be borne equally by the two parties." Each party is required to "bear their own attorney fees."

In regard to confidentiality, the arbitration provision prohibits the disclosure of the terms or substance of the arbitration award except in limited circumstances:

> **F. Confidentiality.** Neither party nor the arbitrator(s) may disclose the terms or substance of the arbitration award, except as required by law or as necessary to file a motion to confirm the award, and in that event, the parties shall take all appropriate action to request that the records of the arbitration be submitted to the court under seal.

The arbitration provision also states that the arbitration decision is "final and binding," that Kaiser members "waive their rights to jury or court trial," and that "[w]ith respect to any matter not expressly provided for herein, the arbitration shall be governed by [HRS] Chapter 658."

According to Kaiser, it "provides copies of the current Group Service Agreement to employers annually and they are responsible for making it available to their Kaiser member-employees for review. In addition, Kaiser employee-members may request a copy of the Group Service Agreement that is applicable to them by contacting Kaiser's Customer Service Department."

Kaiser also states that its Group Agreements are "reviewed and renegotiated with employers on an annual basis, as necessary." Kaiser attached a copy of its 2009 Group Agreement with its Motion to Compel Arbitration and argues that the 2009 Agreement governed the "rights and responsibilities" of Kaiser and Michael in 2009, "when the events at issue in this case occurred." As with the 2003 Group Agreement, there is no evidence in the record that the 2009 agreement was provided to Michael, other than Kaiser's assertion that it provides copies of the Group Agreement to employers.

The 2009 Group Agreement reflects several changes to the arbitration provisions as compared to the 2003 Group Agreement.[6] The general provision providing that all claims are subject to binding arbitration[7] and the confidentiality provision remained substantively unchanged.

However, the provision on ERISA was changed to provide that claims for benefits brought by members of private employer groups under ERISA § 502(a)(1)(B) are not subject to mandatory binding arbitration. The discovery provision was also changed to further limit discovery, permitting brief depositions of only three "critical witnesses" in addition to medical personnel.[8]

---

6. The 2009 Group Agreement provides that "[t]he arbitration provisions in this Service Agreement shall supercede those in any prior Service Agreement."

7. Section 8(A) of the 2009 Group Service Agreement provides:

> **A. Binding Arbitration.** Except as provided below, any and all claims, disputes, or causes of action arising out of or related to this Service Agreement, its performance or alleged breach, or the relationship or conduct of the parties, including but not limited to any and all claims, disputes, or causes of action based on contract, tort, statutory law, or actions in equity, shall be resolved by binding arbitration as set forth in this Service Agreement.
> (1) This includes but is not limited to any claim asserted:
> (a) By or against a Member, a patient, the heirs or the personal representative of the estate of the Member or patient, or any other person entitled to bring an action for damages for harm to the Member or patient as permit-

ted by applicable federal or Hawai'i state law existing at the time the claim is filed ("Member Parties");
> (b) On account of death, bodily injury, physical ailment, mental disturbance, or economic loss arising out of the rendering or failure to render medical services or the provision or failure to provide benefits under this Service Agreement, premises liability, or arising out of any other claim of any nature, irrespective of the legal theory upon which the claim is asserted; and
> (c) By or against one or more of the following entities or their employees, officers or directors ("Kaiser Permanente Parties")[.]

8. The discovery provision in the 2009 Group Agreement provides:

> (3) Limited civil discovery shall be permitted only for
> (a) production of documents that are relevant and material,
> (b) taking of brief depositions of treating physicians, expert witnesses and parties ...

The parties' responsibility for arbitration expenses was altered as well, to lessen the member's share to a third of the costs for the arbitration service and the arbitrator, while responsibility for other fees remained unchanged, so that each party bears their own attorney's fees, witness fees, and discovery costs. In addition, the provision on the applicable law for "any matter not expressly provided for herein" was changed to provide that such matters would be governed by the Federal Arbitration Act (FAA), 9 U.S.C. § 1 et seq., rather than HRS Chapter 658.

Although the first page of the 2009 Group Agreement provides a "2009 Summary of Important Changes for Kaiser Permanente Group HMO Plans Contract Renewals," none of the changes detailed above are listed in the summary.

### B.

The facts alleged in the Siopeses' Complaint were as follows. In October 2009, Michael contacted his Kaiser primary care physician on Maui regarding a persistent upper abdominal pain. He was prescribed medication, and blood tests were ordered for him.

On January 11, 2010, Michael again contacted his physician because he continued to experience persistent abdominal pains. After several tests were conducted over the next month, an upper endoscopy and biopsy conducted on February 16, 2010 revealed an ulcerated cancer tumor at the junction of Michael's esophagus and stomach.

The following day, Michael requested an outside referral from Kaiser for the purpose of seeking a second medical opinion, but was advised to wait until after he had consulted a Kaiser surgeon. An appointment was scheduled for February 19, 2010, with a general surgeon at Kaiser's Moanalua facility on Oʻahu.

The Siopeses flew to Oʻahu to meet with the general surgeon, who informed them that Michael had been diagnosed with "small cell" neuroendocrine carcinoma of the gastroesophageal junction, a very rare, aggressive and fatal form of cancer. The general surgeon explained that Kaiser would develop a course of treatment based on this diagnosis. He informed the Siopeses that he had never seen or treated this form of cancer at the juncture of the esophagus and stomach and did not know of anyone within the Kaiser Hawaiʻi network with expertise in this area. He indicated that he would need to do "internet research" in order to formulate a proper treatment plan. Nevertheless, the surgeon informed the Siopeses that the cancer could become fatal within a month and required urgent treatment. He therefore wanted to immediately perform a complete surgical resection of Michael's stomach and esophagus.

Two days later, the general surgeon informed Michael that the surgery was scheduled to take place in nine days. The surgeon acknowledged that he was still completing his research.

The Siopeses decided to seek a second opinion at Duke University Medical Center (Duke) in North Carolina, a high volume cancer center specializing in treating esophageal and stomach cancers. Upon learning that Duke was willing to immediately evaluate him, Michael contacted the Kaiser general surgeon in order to have his pathology slides sent to Duke. When Michael spoke to the surgeon later that day, the surgeon stated that after conducting additional internet research and speaking with an oncologist, he had concluded that his initial treatment plan may have been inappropriate. The surgeon suggested that Michael have additional imaging studies done and possibly undergo some radiation and chemotherapy before the surgery. The surgeon further stated that he had emailed a Kaiser oncologist to request a consultation but that no appointment had yet been scheduled.

The next day, February 23, 2010, the Siopeses flew to North Carolina so that Mi-

---

and a maximum of three other critical witnesses for each side (i.e., respondents or claimants), and

  (c) independent medical evaluations. The arbitrator(s) shall resolve any discovery disputes submitted by any party, including entry of protective orders or other discovery orders as appropriate to protect a party's rights under this paragraph.

chael could be examined by the medical team at Duke. On February 24, the Kaiser oncologist contacted Michael and scheduled an appointment for March 8, 2010.

On February 25, 2010, Michael arrived at Duke. A multidisciplinary cancer treatment team determined that Kaiser's diagnosis of "small cell" neuroendocrine carcinoma was erroneous, and Michael actually had a "high grade" neuroendocrine tumor. The Duke team explained that this was a serious error, as these types of cancer require different treatment courses. The Duke team recommended a treatment plan that combined measured chemotherapy and targeted radiation to shrink the cancer tumor, followed by surgical removal of the tumor.

The Siopeses elected to remain at Duke so that Michael could immediately begin the recommended course of treatment. On March 3, 2010, a Kaiser physician agreed to provide a referral for Michael's evaluation and treatment at Duke and routed the request to Michael's primary care physician, the Kaiser oncologist, and the Kaiser general surgeon. On March 22, 2010, Michael's primary care physician, after reviewing the Duke medical records, made a referral to Duke for treatment and requested that the treatment be covered by the Kaiser Group Plan.

Michael underwent radiation and chemotherapy treatment at Duke between March 8 and April 20, 2010. On March 29, Michael received a letter from Kaiser denying his request for Kaiser to cover the costs of his treatment at Duke. Kaiser's reasoning was that Kaiser had the capacity to perform radiation and chemotherapy treatment, although Kaiser had not ordered or prescribed either treatment for Michael.

On June 3, 2010, Michael's primary care physician made another referral request for Kaiser to cover the cost of Michael's surgery at Duke. On June 4, Michael underwent thoracic surgery at Duke. On June 9, he re-

ceived a letter from Kaiser again denying his request for coverage.

Duke's treatment was successful and resulted in eliminating the cancer while preserving intact the majority of Michael's stomach and esophagus. On July 1, 2010, Michael was cleared by Duke to return to Maui.

Between July and December 2010, Michael filed two appeals with the Kaiser Permanente Appeals Coordinator, requesting that Kaiser provide coverage for the testing and treatment at Duke. Kaiser denied both appeals based on its assertion that the Duke treatment constituted "elective, nonemergency, non-urgent care" that was not directed or authorized by Kaiser.

In total, the Siopeses estimate that they incurred over $250,000 in medical expenses at Duke.

## C.

On November 9, 2011, the Siopeses filed suit against Kaiser in circuit court.[9] The Siopeses asserted claims for breach of contract, medical negligence, insurance bad faith, violations of Hawaiʻi's consumer protection law (HRS Chapter 480), breach of fiduciary duty, negligent infliction of emotional distress, declaratory and injunctive relief, and punitive damages.

The Siopeses sought a declaration that the mandatory arbitration requirement in the Kaiser Group Agreement was void and unenforceable because "it denies Members rights guaranteed by Hawaiʻi law, makes it impossible for a Member who is wrongfully denied benefits to be made whole, and provides an adjudicatory process that is unconscionable and heavily biased in Kaiser's favor." The Complaint cited the arbitration provision's prohibition of the recovery of attorneys' fees and costs, limitations on discovery, exemption for members of private employer Groups bringing ERISA claims, and inclusion of a confidentiality provision, as reasons why the provision should be declared void and unenforceable.[10] The Siopeses also claimed in

---

9. The Honorable Karen T. Nakasone presided.

10. The Complaint specifically alleged that the arbitration clause prevents a Kaiser member "from recovering attorneys' fees and costs in-

curred in connection with a breach of contract claim, an insurance coverage claim, or a claim for unfair and deceptive business practices and/or unfair competition under [HRS] Chapter 480," thereby "mak[ing] it impossible for a Plan

this regard that the arbitration provision is a provision of adhesion for which Michael had neither choice nor bargaining power to challenge.

The Siopeses also contended that the arbitration provision was inapplicable to Lacey's claims "because she has never been a Plan Member or otherwise agreed to be bound by the arbitration provision[.]"

The Siopeses sought declaratory and injunctive relief to permanently enjoin Kaiser from enforcing the arbitration provision.

On January 10, 2012, Kaiser filed its Motion to Compel Arbitration and Motion to Stay Discovery pending the ruling on the motion to compel.

Kaiser argued in its Motion to Compel Arbitration that the Siopeses' claims were governed by the 2009 Group Agreement between Kaiser and the EUTF. Kaiser contended that the arbitration provision was valid and enforceable because the provision was in writing, unambiguous as to the parties' intent to submit disputes to arbitration, and supported by bilateral consideration. Additionally, Kaiser contended that the arbitration provision was not an unenforceable contract of adhesion, but was substantively similar to the arbitration agreement upheld by this court in *Leong v. Kaiser Found. Hosps.*, 71 Haw. 240, 788 P.2d 164 (1990), which involved a group agreement negotiated between Kaiser and the Public Employees Health Fund.

In the Siopeses' response in opposition to the Motion to Compel Arbitration, they argued that a valid agreement to arbitrate was not formed between Kaiser and Michael because Michael did not assent to the arbitration provision by signing the Enrollment Form.[11] They noted that the Enrollment Form did not contain an arbitration agreement or suggest that one existed, the Group Agreement containing the arbitration provision was not signed by Michael, and there was no indication that the Siopeses reviewed and understood its contents.

Kaiser responded by arguing that while the Enrollment Form did not itself contain a reference to the arbitration agreement, the form's statement that the enrollee "agree[s] to abide by the terms and conditions of the benefit plans I selected" was sufficient to alert Michael to the arbitration provision contained in the Group Agreement.

Following a hearing, the circuit court granted Kaiser's motions. Regarding the Motion to Compel Arbitration, the circuit court stated that the scope of its review on a motion to compel arbitration was "narrow and circumscribed" and consisted of inquiring first, whether there was a valid agreement to arbitrate, and second, whether the agreement encompasses the dispute at issue. The court concluded that the decision in *Leong*, 71 Haw. 240, 788 P.2d 164 was "directly on point and controlling." The court found that the facts in this case were similar to those in *Leong*, "where the Supreme Court held that the plaintiffs' mere averment that they did not receive the [Kaiser] booklet containing the arbitration reference ... without more, was insufficient to negate the requirement of binding arbitration contained in the contract." Thus, the court found that the two-step inquiry for compelling arbitration was satisfied.

Member to recover his full loss or be made whole." With respect to discovery, the Complaint alleged that the arbitration provision's "limited civil discovery" unfairly advantages Kaiser, "which has ready access to records, physicians, nurses, administrators, claims personnel, appeal officers, and others who were involved in the events that gave rise to a party's claims."

In regard to the ERISA provision, the Complaint alleged that the arbitration provision requires public employee Group Plan Members, but not private employee members, to arbitrate their claims. The Complaint asserted that this practice "constitutes unfair discrimination between insureds having substantially like insuring, risk, and exposure factors and expense elements, and constitutes an unfair method of competition and an unfair and deceptive act or practice under HRS § 431:13-103(a)."

Finally, the Complaint alleged that the confidentiality provision, which prohibits Kaiser members "from disclosing 'the substance of the arbitration proceedings or award,'" has the effect of concealing "adverse adjudicatory findings" and "denies ... consumers information that is essential to the decision of whether to purchase and maintain health insurance through Kaiser."

11. The Siopeses had no opposition to the Motion to Stay Discovery.

The court also found that Lacey's claims were "within the scope of the broad arbitration provisions contained [in the Group Agreement]." The court did not review the Siopeses' claims of unconscionability based on its conclusion that the claim was a "separate issue from what the court has to review here, which is a very narrow scope, whether there's a valid agreement to arbitrate."

## II.  APPEAL

■■ The Siopeses timely appealed the circuit court's orders,[12] and petitioned to transfer their appeal from the Intermediate Court of Appeals (ICA) to this court.[13] On August 29, 2012, this court issued an order granting the transfer. The Siopeses raise three points of error on this appeal:

A. The Circuit Court erred by failing to find the arbitration provision unenforceable as to Michael Siopes and by failing to examine the specific issues raised by Michael Siopes as to mutual assent and bilateral consideration.

B. The Circuit Court erred by compelling Lacey Siopes to arbitrate her distinct claims for injury, since she was not a Kaiser member and had never agreed to be bound by any provisions of the Kaiser plan.

C. The Circuit Court erred by failing to review the terms of Kaiser's arbitration provision, which are unconscionable and therefore unenforceable.

## III.  STANDARD OF REVIEW

A petition to compel arbitration is reviewed *de novo*. The standard is the same as that which would be applicable to a motion for summary judgment, and the trial court's decision is reviewed "using the same standard employed by the trial court and based upon the same evidentiary materials as were before [it] in determination of the motion."

*Brown v. KFC Nat'l Mgmt. Co.*, 82 Hawai'i 226, 231, 921 P.2d 146, 151 (1996) (citations omitted) (brackets in original).

## IV.  DISCUSSION

### A.

■■ " 'When presented with a motion to compel arbitration, the court is limited to answering two questions: 1) whether an arbitration agreement exists between the parties; and 2) if so, whether the subject matter of the dispute is arbitrable under such agreement.' " *Douglass v. Pflueger Haw., Inc.*, 110 Hawai'i 520, 530, 135 P.3d 129, 139 (2006) (quoting *Koolau Radiology, Inc. v. Queen's Med. Ctr.*, 73 Haw. 433, 445, 834 P.2d 1294, 1300 (1992)) (brackets omitted). The party seeking to compel arbitration carries the initial burden of establishing that an arbitration agreement exists between the parties. *Cnty. of Haw. v. Unidev, LLC*, 128 Hawai'i 378, 387, 289 P.3d 1014, 1023 (App.2012) [hereinafter *Unidev I* ], *vacated in part, aff'd in part on other grounds, Unidev II*, 129 Hawai'i 378, 301 P.3d 588 (2013). If this initial burden is met, the burden shifts to the opposing party to "present evidence on its defenses to the arbitration agreement." *Unidev I*, 128 Hawai'i at 387, 289 P.3d at 1023. *See* 4 Am.Jur.2d *Alternative Dispute Resolution* § 98 (2007).

"Even though arbitration has a favored place, there still must be an underlying agreement between the parties to arbitrate. Without an agreement to arbitrate, a court may not force parties to engage in arbitration." *Luke v. Gentry Realty, Ltd.*, 105 Hawai'i 241, 247, 96 P.3d 261, 267 (2004) (citations and quotation marks omitted). Accordingly, "[a]lthough their terms are not

---

12. HRS § 641–1(a) (Supp.2012) provides that "[a]ppeals shall be allowed in civil matters from all final judgments, orders, or decrees of circuit and district courts ... to the intermediate appellate court, subject to chapter 602." Orders compelling arbitration are appealable final orders within the contemplation of HRS § 641–1. *Cnty. of Haw. v. UniDev, LLC*, 129 Hawai'i 378, 392, 301 P.3d 588, 602 (2013) [hereinafter *Unidev II* ].

13. HRS § 602–58 (Supp.2012) and Hawai'i Rules of Appellate Procedure Rule 40.2 (2012) set forth the requirements for this court to grant an application for transfer of a case within the jurisdiction of the ICA to this court.

identical, both the FAA[14] and HRS ch. [658A][15] interpose a written and otherwise valid contract to arbitrate as a precondition to enforcement." *Brown v. KFC Nat'l Mgmt. Co.*, 82 Hawai'i 226, 238, 921 P.2d 146, 158 (1996).

We have held that "in order to be valid and enforceable, an arbitration agreement must have the following three elements: (1) it must be in writing; (2) it must be unambiguous as to the intent to submit disputes or controversies to arbitration; and (3) there must be bilateral consideration." *Douglass*, 110 Hawai'i at 531, 135 P.3d at 140 (citing *Brown*, 82 Hawai'i at 238–40, 921 P.2d at 158–60).

▌With respect to the second requirement, "there must be a mutual assent or a meeting of the minds on all essential elements or terms to create a binding contract." *Douglass*, 110 Hawai'i at 531, 135 P.3d at 140 (quoting *Earl M. Jorgensen Co. v. Mark Constr., Inc.*, 56 Haw. 466, 470, 540 P.2d 978,

982 (1975)) (brackets, ellipses and quotation marks omitted) (emphasis added). "The existence of mutual assent or intent to accept is determined by an objective standard.... Unexpressed intentions are nugatory when the problem is to ascertain the legal relations, if any, between two parties." *Douglass*, 110 Hawai'i at 531, 135 P.3d at 140 (quotation marks omitted).

The Siopeses' primary contention is that the second requirement of mutual intent to submit to arbitration is not present in this case because Michael did not assent to the arbitration agreement when he enrolled in the Kaiser plan.[16] Michael does not dispute that he entered into a contractual relationship with Kaiser for health services, which he financed through deductions from his pay. However, Michael disputes that a valid agreement to arbitrate was formed between he and Kaiser, given that he had no knowledge of the existence of the arbitration provision at the time of his enrollment.[17]

14. Section 2 of the FAA provides in relevant part that "[a] written provision in ... a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction ... shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2 (2012).

Under Section 2 of the FAA, "[s]tates may regulate contracts, including arbitration clauses, under general contract law principles and they may invalidate an arbitration clause 'upon such grounds as exist at law or in equity for the revocation of any contract.'" *Allied–Bruce Terminix Cos. v. Dobson*, 513 U.S. 265, 281, 115 S.Ct. 834, 130 L.Ed.2d 753 (1995) (quoting 9 U.S.C. § 2). "Thus, generally applicable contract defenses, such as fraud, duress, or unconscionability, may be applied to invalidate arbitration agreements without contravening § 2." *Doctor's Assocs., Inc. v. Casarotto*, 517 U.S. 681, 687, 116 S.Ct. 1652, 134 L.Ed.2d 902 (1996). *See First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944, 115 S.Ct. 1920, 131 L.Ed.2d 985 (1995) ("When deciding whether the parties agreed to arbitrate a certain matter (including arbitrability), courts generally ... should apply ordinary state-law principles that govern the formation of contracts.").

15. In 2001, Hawai'i adopted the Revised Uniform Arbitration Act, codified in HRS chapter 658A, and repealed HRS chapter 658. 2001 Haw. Sess. Laws Act 265, § 5 at 820 (repealing HRS chapter 658); 2001 Haw. Sess. Laws Act 65, § 1 *et seq.* at 810–20 (enacting HRS chapter

658A). HRS chapter 658A governs arbitration agreements "made on or after July 1, 2002," unless the parties otherwise agree, but "[a]fter June 30, 2004, this chapter governs an agreement to arbitrate whenever made." HRS § 658A-3 (Supp.2012).

> Prior to 2001, HRS § 658–1 (1993) provided, A provision in a written contract to settle by arbitration a controversy thereafter arising out of the contract or the refusal to perform the whole or any part thereof, or an agreement in writing to submit an existing controversy to arbitration pursuant to section 658-2, shall be valid, enforceable, and irrevocable, save only upon such grounds as exist for the revocation of any contract.

Currently, HRS § 658A-6(a) (Supp.2012) provides, "An agreement contained in a record to submit to arbitration any existing or subsequent controversy arising between the parties to the agreement is valid, enforceable, and irrevocable except upon a ground that exists at law or in equity for the revocation of a contract."

16. The parties do not dispute that the arbitration provision constitutes a writing. Although the parties dispute the issue of bilateral consideration, we resolve the enforceability of the arbitration agreement on the basis of the mutual assent requirement and therefore do not reach the question of bilateral consideration.

17. "Challenges to the validity of arbitration agreements 'upon such grounds as exist at law or in equity for the revocation of any contract' can

Kaiser takes the position that Michael's assent to the arbitration agreement is irrelevant because the arbitration agreement is "binding on him and those claiming through him by virtue of the agreement between Kaiser and the EUTF." For this proposition, Kaiser relies on this court's decision in *Leong v. Kaiser Found. Hosps.*, 71 Haw. 240, 788 P.2d 164 (1990), holding that an arbitration provision contained in a Kaiser health plan, which was negotiated between Kaiser and the Public Employees Health Fund, the EUTF's predecessor,[18] was enforceable against Kaiser members who enrolled through the Health Fund.

Kaiser's reliance on *Leong*, however, is misplaced for the following reasons. First, the *Leong* court's analysis is not applicable here because in that case, the parties did not dispute the validity of the *formation* of the arbitration agreement between Kaiser and the plaintiffs. In *Leong*, it was undisputed that the arbitration provision, upon being added to the health plan contract, was summarized in a booklet that was distributed to public employees covered by the Health Fund. *Id.* at 246, 788 P.2d at 168. Despite such evidence, the plaintiffs "insist[ed] that they failed to receive a copy of the booklet" and argued that they were not bound by the arbitration term because "they had no actual knowledge of this provision in the contract." *Id.* The plaintiffs did not argue that an agreement to arbitrate was not formed due to a lack of mutual assent. Accordingly, the *Leong* court did not analyze the issue of contract <u>formation,</u> including the element of mutual assent, in response to the plaintiffs' claim that the arbitration agreement was unenforceable. Instead, the *Leong* court proceeded with its analysis on the basis that the plaintiffs had validly assented to the contract and its terms: "The general rule of contract law is that <u>one who assents to a contract is bound by it</u> and cannot complain that he has not read it or did not know what it con-

tained." *Id.* at 245, 788 P.2d at 168 (emphasis added).

There is a significant distinction between the issue of lack of knowledge as to a contract provision and lack of mutual assent to a contract provision; the former issue assumes the existence of a valid agreement while the latter questions whether an agreement to arbitrate was actually formed. In this case, the issue is whether Michael assented to the arbitration provision in the first instance, when he enrolled in the Kaiser plan by signing the Enrollment Form. Therefore, the focus of the inquiry is one of contract <u>formation,</u> which the *Leong* plaintiffs did not raise and which the *Leong* court did not address.

This court made the same distinction between lack of knowledge and lack of mutual assent to a contract provision in *Douglass*, 110 Hawai'i 520, 135 P.3d 129. The issue in *Douglass* was whether an employee who signed an acknowledgment form located at the end of the employer's Employee Handbook was bound by the arbitration provision set forth in the handbook. *Id.* at 522–24, 135 P.3d at 131–33. Unlike *Leong*, the parties "raised issues regarding the validity and enforceability of the alleged arbitration agreement[.]" *Id.* at 525, 135 P.3d at 134.

In its analysis of whether the arbitration agreement met the traditional requirements for contract formation, the *Douglass* court noted the differences between its inquiry and the court's inquiry in *Leong*:

> We do not suggest, however, that one who is aware that he or she is entering into a contract may avoid its effect by failing to read it. Such a rule would undermine reliance on written instruments. Indeed, we have stated that "the general rule of contract law is that one who assents to a contract is bound by it and cannot complain that he has not read it or did not know what it contained." In *Leong*, the <u>plaintiffs did not dispute the existence of a contract, which contained an arbitration</u>

---

be divided into two types. One type challenges specifically the validity of the agreement to arbitrate. The other challenges the contract as a whole...." *Buckeye Check Cashing, Inc. v. Cardegna,* 546 U.S. 440, 444, 126 S.Ct. 1204, 163 L.Ed.2d 1038 (2006) (citations omitted). Mi-

chael's claim in this case is of the first type, as he specifically challenges the enforceability of the arbitration provision rather than the validity of the Group Agreement as a whole.

**18.** *See supra* note 1.

provision. Rather, they argued that "they should not be bound by the agreement to arbitrate because they had no knowledge of this provision in the contract." Here, however, the arbitration "agreement" does not meet the traditional requirements necessary to the formation of a contract.

*Id.* at 534 n. 12, 135 P.3d at 143 n. 12 (citations and brackets omitted) (emphases added).

Thus the court distinguished *Leong* on the basis that the *Leong* plaintiffs did not dispute whether the arbitration agreement met the traditional requirements necessary for the formation of a contract, but argued only that they should not be bound by the agreement because they had no knowledge of it. In this case, as in *Douglass*, the Sioposes dispute the formation of an arbitration agreement based on the absence of mutual assent. Therefore, *Leong* is not applicable to this case and lends no support to Kaiser's assertion that Michael's assent to the arbitration agreement is irrelevant to the court's analysis.

Second, even if it was applicable, *Leong* is factually distinguishable from the instant case. In *Leong*, it was "undisputed that Kaiser prepared a booklet summarizing the essential terms of the Plan for distribution for public employees covered by the Health Fund," and that the booklet included notice of the arbitration provision. 71 Haw. at 246, 788 P.2d at 168. "Affidavits were submitted attesting to the usual manner of distributing such information to all public employees and averring that the routine was adhered to at all times pertinent to this case." *Id.* In this context, the *Leong* court held that the plaintiffs' "averment that they did not receive the booklet, without more, is insufficient to negate a provision for binding arbitration contained in the contract." *Id.*

In this case, on the other hand, it is far from "undisputed" that the 2003 or 2009 Group Agreement containing the arbitration provision was distributed to Michael. Kaiser submitted a single declaration with its Motion to Compel Arbitration, by a Kaiser Manager of Contract and Benefit Administration, stating that "Kaiser provides copies of the current Group Service Agreement to employers annually and they are responsible for making it available to their Kaiser member-employees for review." The declaration also provided that "Kaiser employee-members may request a copy of the Group Service Agreement that is applicable to them by contacting Kaiser's Customer Service Department." However, the record does not contain any evidence that Michael received a copy of the Group Agreement, and no evidence was submitted pertaining to the usual manner in which the Group Agreement is annually distributed to the Kaiser member-employers.

Furthermore, inasmuch as this case centers on the formation of the arbitration agreement and Michael's assent to the arbitration provision at the time he entered into the agreement with Kaiser through the EUTF, the critical question is whether Michael had notice of and assented to the arbitration agreement at the time he signed the Enrollment Form. Michael's declaration provides: "Prior to signing the Enrollment Form, I do not recall being provided a copy of the Group Service Agreement or any other documentation." The burden was on Kaiser, as the party moving to compel arbitration, to demonstrate that Michael mutually assented to the arbitration agreement. Although Kaiser acknowledges that it has the burden of satisfying the statutory requirements for disclosure of the enrollee's rights, responsibilities, and obligations and information on complaints and appeals procedures to the enrollee at the time of enrollment, Kaiser does not claim that it had a policy of requiring employers to provide prospective members with a copy of the applicable Group Agreement prior to or contemporaneously with the execution of the Enrollment Form.[19]

19. HRS § 432E–7(a) (Supp.2003) requires a managed care plan to provide certain information, including a "statement on enrollee's rights, responsibilities, and obligations" and "[i]nformation on complaints and appeals procedures," to the enrollee upon enrollment in the plan:

The managed care plan shall provide to its enrollees upon enrollment and thereafter upon request the following information:

(1) A list of participating providers which shall be updated on a regular basis indicating, at a minimum, their specialty and whether the provider is accepting new patients;

■ Third, Kaiser relies primarily on the *Leong* court's statement that the Kaiser Plan was a product of negotiations between two parties of equal bargaining power, the Health Fund and Kaiser, in order to argue that Michael's assent to arbitration is irrelevant. However, the *Leong* court made its observation of equal bargaining power in the context of determining whether the Kaiser Plan was a contract of adhesion, and not in the context of determining whether an arbitration agreement was validly formed through mutual assent. 71 Haw. at 247–48, 788 P.2d at 168–69. The asserted equal bargaining power of the EUTF and Kaiser is irrelevant for the purposes of determining whether an agreement to arbitrate was formed between Kaiser and Michael.

Finally, this court has held in cases decided subsequent to *Leong* that in order to be valid and enforceable, an arbitration agreement must be unambiguous as to the intent of the parties to submit disputes or controversies to arbitration. *Brown*, 82 Hawai'i 226, 921 P.2d 146; *Douglass*, 110 Hawai'i 520, 135 P.3d 129.

---

(2) A complete description of benefits, services, and copayments;
(3) A statement on enrollee's rights, responsibilities, and obligations;
(4) An explanation of the referral process, if any;
(5) Where services or benefits may be obtained;
(6) Information on complaints and appeals procedures; and
(7) The telephone number of the insurance division.
This information shall be provided to prospective enrollees upon request.
(Emphases added). A "managed care plan" means "any plan, regardless of form, offered or administered by any person or entity, including but not limited to ... a health maintenance organization governed by chapter 432D, ... and any other mixed model, that provides for the financing or delivery of health care services or benefits to enrollees...." HRS § 432E–1 (Supp. 2003).
Likewise, HRS § 432D–25 (Supp.2003) requires all health maintenance organizations to "provide current and prospective enrollees with written disclosure of coverages and benefits, including information on coverage principles and any exclusions or restrictions on coverage," for the purpose of "ensur[ing] that all individuals understand their health care options and are able to make informed decisions." (Emphasis added). "Health maintenance organization" means

---

In *Brown*, the court held that an arbitration agreement set forth in an employment application constituted a valid agreement binding the plaintiff-employee to arbitrate employment-related disputes.[20] 82 Hawai'i at 237–40, 921 P.2d at 157–60. The arbitration provision was contained in a section of the application entitled "Agreement," and a subsection styled "Arbitration Of Employee Rights." *Id.* at 229, 921 P.2d at 149. The signature line for the applicant appeared just below the arbitration agreement. *Id.* at 229, 245, 921 P.2d at 149, 165.

As stated, the *Brown* court determined that in order to be valid and enforceable, an arbitration agreement must be in writing, reflect mutual assent, and be supported by bilateral consideration. *Id.* at 237–40, 921 P.2d at 157–60. In regard to the mutual assent requirement, the court found that the arbitration agreement at issue reflected mutual assent and consideration for that mutual assent "on its face," based on the language used in the provision. *Id.* at 240, 921 P.2d at 160.

---

"any person that undertakes to provide or arrange for the delivery of basic health care services to enrollees on a prepaid basis, except for enrollee responsibility for copayments, deductibles, or both." HRS § 432D–1 (Supp.2003).
At oral argument, Kaiser argued that it satisfied its obligation to disclose to enrollees the terms and conditions of the Kaiser group health plan by contractually requiring the EUTF to provide this information. Oral Argument at 30:17 (May 16, 2013), Siopes v. Kaiser Found. Health Plan, Inc., No. SCAP–12–0000361, *available at* http://www.courts.state.hi.us/courts/oral_arguments/archive/oasc12361.html. Kaiser noted in this regard that the Group Agreement provides that all information Kaiser provides to the Group will in turn be communicated to all enrollees. While Kaiser is not precluded from delegating its duty to disclose to another entity such as the EUTF, Kaiser remains ultimately responsible for ensuring that its statutory obligations are satisfied.

20. The arbitration agreement provided in relevant part, "Because of the delay and expense which results from the use of the federal and state court systems, KFC and I agree to submit to binding arbitration any controversies concerning my compensation, employment, or termination of employment, rather than to use such court systems." *Id.* at 230, 921 P.2d at 150 (brackets omitted).

Later in the opinion, the court discussed the "arbitration agreement within the greater context of the document in which it is located in order to determine whether any party to it could reasonably have failed to understand that it was intended to govern the entire galaxy of employment-related controversies." *Id.* at 245, 921 P.2d at 165. In particular, the court looked at the effect of a disclaimer in the application providing that "nothing contained in this application ... shall constitute an implied or expressed contract of employment." *Id.* (quotation marks omitted). The court emphasized the manner in which the arbitration agreement was set off from other provisions in the application, thus "highlight[ing]—rather than camouflag[ing]—its general purpose," and concluded that given this context, the disclaimer could not reasonably be construed to negate the arbitration provision. *Id.*

Subsequently in *Douglass,* the court applied the three elements of the *Brown* test in determining whether a valid arbitration agreement was formed and specifically distinguished the case from *Leong* based on the contract formation issues raised by the parties. 110 Hawai'i 520, 135 P.3d 129.

In *Douglass,* the plaintiff was hired by the employer and received the employer's Employee Handbook, which contained the employer's policies and procedures as well as an arbitration provision. *Id.* at 523, 135 P.3d at 132. The arbitration provision provided that "[a]ny and all claims arising out of the employee's employment with the Company and his/her termination shall be settled by final binding arbitration" in accordance with the FAA. *Id.* The plaintiff signed an acknowledgment form located towards the end of the Handbook, separated by approximately forty pages from the arbitration provision. *Id.* at 523–24, 135 P.3d at 132–33. By signing the form, the plaintiff acknowledged that he received a copy of the Handbook and "read and underst[ood] the information outlined in the handbook." *Id.* at 523, 135 P.3d at 132. The acknowledgment form also provided that the provisions in the Handbook were "presented

as a matter of information only and do not constitute an employment contract." *Id.* A "disclaimer" preceding the acknowledgment form further stated that the policies in the Handbook "are intended as guidelines" and are "not intended to and do not create a contract between you and the company." *Id.* at 532, 135 P.3d at 141.

On appeal, this court held that the arbitration provision was not valid and enforceable, concluding that the parties had not mutually assented to arbitration.[21] *Id.* at 531–34, 135 P.3d at 140–43. The court found that the language used in the arbitration provision reflected mutual assent "on its face," as was the case in *Brown. Id.* at 532, 135 P.3d at 141. Nevertheless, the court looked beyond the language of the arbitration provision to the "surrounding circumstances presented" in the case and concluded that it could not find mutual assent between the parties to arbitrate their disputes. *Id.*

In considering the surrounding circumstances, the court held that the plaintiff "merely acknowledged his receipt and understanding of the items presented to him," but "never expressed assent to the terms contained in those items, except for those terms expressly stating that the policies in the Handbook did 'not create a contract,' were to be treated as 'guidelines,' and were presented for 'information only.'" *Id.* at 533, 135 P.3d at 142. The court noted that the acknowledgment form "makes no mention of the arbitration provision contained in the Handbook, nor sufficiently informs him that the Handbook contains terms to which he is contractually obligating himself. Nothing in the acknowledgment form that [the plaintiff] signed suggests to us that he was entering into an arbitration agreement." *Id.*

The *Douglass* court distinguished the case from *Brown,* explaining that the arbitration provision in *Douglass* was "*not* 'boxed off' or otherwise set apart from the other provisions in the Handbook or on the acknowledgment form." *Id.* The court further elaborated:

21. The *Douglass* court additionally held that the arbitration agreement failed for lack of bilateral consideration because the employer reserved the right to change the Employee Handbook "at any time and without advance notice." *Id.* at 534–36, 135 P.3d at 143–45 (quotation marks omitted).

In fact, the arbitration provision, like all the other provisions in the Employee Handbook, is (1) introduced by its own bold faced heading and (2) in the same font size as the rest of the Handbook. Moreover, the agreement, unlike the agreement in *Brown* that was set off and on the same page as the signature line, is located on page 20 of the sixty-page Handbook, and [the plaintiff's] signature is not found until forty pages later on the acknowledgment page, which ... makes no mention of the arbitration provision.

*Id.*

The court reiterated that the Acknowledgment form was "uninformative" and failed to call attention to the arbitration clause. *Id.* Although the record showed that the employer's human resources administrator reviewed the Handbook with the plaintiff as part of his orientation, the record did not reveal whether she specifically mentioned the arbitration provision. *Id.* at 533–34, 135 P.3d at 142–43. The court concluded, "The record before us ... does not indicate that [the plaintiff] was informed of the existence of the arbitration provision, let alone that he would be bound by it." *Id.* at 533, 135 P.3d at 142. Therefore, the court held that the mutual assent requirement was not satisfied and the plaintiff could not be compelled to arbitrate his claims against the employer. *Id.* at 534, 135 P.3d at 143.

■ In comparison to *Douglass*, the facts of this case are far less indicative of the parties' mutual assent to arbitration. In *Douglass*, the arbitration provision was at least contained within a document that was made available to the employee at the time he signed the acknowledgment form. Nevertheless, the court concluded, after considering the "surrounding circumstances," that the record did not demonstrate that the employee was "put on notice regarding the existence of the arbitration provision and the binding effect thereof." *Id.* In this case, the

arbitration provision was not contained in a document that was made available to Michael at the time of his enrollment, and nothing in the "surrounding circumstances" suggests that Michael was otherwise on notice of the arbitration provision.

The only document Michael signed to enroll in the Kaiser plan was the Enrollment Form. The arbitration provision was contained in a separate document altogether, the Group Agreement. The Enrollment Form itself contains no reference to the Group Agreement or to an arbitration agreement. Unlike the acknowledgment form in *Douglass*, there is no provision on the Enrollment Form providing that the enrollee has read and understood the Group Agreement or any separate document further detailing his or her rights. The Enrollment Form does not indicate that a separate document affecting the enrollee's rights exists at all. Additionally, the certification on the Enrollment Form providing that the enrollee agrees to abide by the "terms and conditions" of the selected benefit plans does not contain a provision stating that the terms and conditions are detailed in the Group Agreement or in any other document.

In *Douglass*, the court considered the acknowledgment form to be "uninformative" and held that the employee was otherwise uninformed of the existence of the arbitration provision, despite the plaintiff's admission that the employer's human resources administrator "showed him the whole handbook." 110 Hawai‘i at 533–34, 135 P.3d at 142–43(brackets and quotation marks omitted). Here, there was no evidence that Michael was even shown the Group Agreement prior to signing the Enrollment Form, let alone that a Kaiser or EUTF representative reviewed the Group Agreement with him. In fact, there is no evidence in the record that Michael was told that the Group Agreement existed and contained the "terms and conditions" of his benefit plans.[22] For its part,

---

**22.** According to Kaiser, "[n]o reasonable consumer of health care coverage could possibly believe that the one-page Enrollment Form represented the entire agreement between Kaiser and the EUTF," or that "there were no other terms or conditions governing a relationship as complex as the purchase of health care services." However, as noted *supra* at note 19, HRS § 432E–7(a)(3) requires a managed care plan to provide the enrollee with a "statement on enrollee's rights, responsibilities and obligations" upon enrollment, and HRS § 432D–25 requires health

Kaiser produced a single declaration averring that it provides the Group Agreement to the employers, who are then responsible for distributing the agreement to the member-employees. However, Kaiser has not claimed that Michael was aware of the Group Agreement or the arbitration provision when he signed the Enrollment Form, as Kaiser's position is that Michael's awareness and assent are irrelevant.

Kaiser argues that *Douglass* and *Brown* are inapplicable to the circumstances of this case because the Group Agreement was negotiated and agreed to between Kaiser and the EUTF. Kaiser's argument misstates the issue. Although the Group Agreement was negotiated and completed between the EUTF and Kaiser, Michael was required to assent to the Group Agreement in order to have formed a valid and enforceable contract with Kaiser. The Siopeses do not argue, as Kaiser suggests, that "every individual employee-beneficiary had the right to assent to or reject the individual terms of the agreement between the EUTF and [Kaiser]." Rather, the relevant issue is whether an agreement to arbitrate was formed between Michael and Kaiser when Michael signed the Enrollment Form. This issue implicates the contract formation requirements discussed in *Brown* and *Douglass*. We have never suggested that contracts for health services fall within an exception to these formation requirements.

"It is an elementary rule of contract law that there must be mutual assent or a meeting of the minds on all essential elements or terms in order to create a binding contract." *Malani v. Clapp*, 56 Haw. 507, 510, 542 P.2d 1265, 1267 (1975). The record in this case does not indicate that Michael "was informed of the existence of the arbitration provision, let alone that he would be bound by it." *Douglass*, 110 Hawai'i at 533, 135 P.3d at 142. Accordingly, it cannot be said that the requirement of mutual assent to arbitration is satisfied, and Michael cannot be compelled to arbitrate his claims against Kaiser, barring any alternative basis for requiring arbitration.

B.

Here, Kaiser alternatively relies on various contract and agency principles to argue that Michael is bound by the terms and conditions of the Group Agreement, including the arbitration clause, regardless of his personal assent.

As stated, generally, "[w]ithout an agreement to arbitrate, a court may not force parties to engage in arbitration." *Luke v. Gentry Realty, Ltd.*, 105 Hawai'i 241, 247, 96 P.3d 261, 267 (2004). *See Sher v. Cella*, 114 Hawai'i 263, 267, 160 P.3d 1250, 1254 (App. 2007) ("Arbitration is a matter of contract; so a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit.") (quotation marks omitted). However, courts have recognized that "[w]ell-established common law principles dictate that in an appropriate case a <u>nonsignatory</u> can enforce, or be bound by, an arbitration provision within a contract executed by other parties." *Int'l Paper Co. v. Schwabedissen Maschinen & Anlagen GMBH*, 206 F.3d 411, 416–17 (4th Cir.2000) (emphasis added). *See* Michael A. Rosenhouse, Annotation, *Application of Equitable Estoppel to Compel Arbitration By or Against Nonsignatory–State Cases*, 22 A.L.R.6th 387, 403 (2007) ("[T]he courts, led by the federal courts, have developed a body of case law on the subject of whether a nonsignatory, that is a person or entity that has not signed an agreement containing an arbitration clause: (a) can compel arbitration against one who has; or (b) can be required to arbitrate by one who has signed the document.") (footnote omitted). These common law principles include incorporation by reference, assumption, agency, veil-piercing/alter ego, estoppel, and third-party beneficiary theories. *Id.* at 403 n. 8. *See Thomson–CSF, S.A. v. Am. Arbitration Ass'n*, 64 F.3d 773, 776–80 (2d Cir.1995); *Comer v. Micor, Inc.*, 436 F.3d 1098, 1101

maintenance organizations to "provide current and prospective enrollees with written disclosure of coverages and benefits," for the purpose of ensuring that such enrollees "understand their health care options and are able to make informed decisions." Clearly, then, the statutory scheme governing health care plans lacks any assumptions regarding the knowledge that a "reasonable consumer" is expected to possess.

(9th Cir.2006); *Arthur Andersen LLP v. Carlisle,* 556 U.S. 624, 631, 129 S.Ct. 1896, 173 L.Ed.2d 832 (2009). In this case, Kaiser argues alternatively that Michael is bound by the arbitration provision under the theories of agency, estoppel, and third-party beneficiary. However, none of these theories are applicable, as Michael is a signatory[23] to the Group Agreement, and this case does not involve a nonsignatory's standing to enforce an arbitration provision or a nonsignatory's attempt to avoid enforcement of an arbitration provision against it.

### 1. Agency

■ Kaiser argues that Michael is bound by the arbitration provision because the EUTF acted as Michael's agent in agreeing to the Group Agreement with Kaiser. Kaiser relies on a provision in the 2003 and 2009 Group Agreement, entitled "Group As Agent for Members," which states, "By requesting and accepting membership under the Group's Service Agreement with Health Plan, Members authorize Group for purposes of entering into this Service Agreement and for all other purposes in regards to this Service Agreement."

> It is hornbook law that an agent can commit its (nonsignatory) principal to an arbitration agreement. But the requirements for such vicarious responsibility are exacting: not only must an agency arrangement exist so that one party acts on behalf of the other and within usual agency principles, but the arrangement must be relevant to the legal obligation in dispute.

*InterGen N.V. v. Grina,* 344 F.3d 134, 147–48 (1st Cir.2003) (citations, quotation marks, brackets and ellipses omitted).

According to the terms of the Group Agreement, the agency relationship between the EUTF and the EUTF employee is entered into only upon the employee's enrollment in the Kaiser plan: "By requesting and accepting membership ... Members authorize Group...." (Emphasis added). The EUTF could not agree on behalf of the individual to request and accept Kaiser membership; the EUTF could only agree to the terms of the Group Agreement. Whether the individual validly assented to the terms of the Group Agreement upon enrollment is a separate question entirely. Thus the agency arrangement referred to in the Group Agreement could not have existed at the time that the EUTF and Kaiser entered into the contract, and in any event would be irrelevant for the purpose of determining whether Michael assented to all of the terms of the Group Agreement.[24]

Although the EUTF was clearly empowered by statute to enter into the Group Agreement with Kaiser on behalf of EUTF employees, this authority does not eliminate the requirement that a valid agreement to arbitrate be formed between EUTF employees and Kaiser.[25] The EUTF employee has the option of choosing to receive health care coverage pursuant to the Kaiser plan. Thus

---

**23.** "Signatory" is defined as "[a] person or entity that signs a document, personally or through an agent, and thereby becomes a party to an agreement." *Black's Law Dictionary* 1507 (9th ed. 2009). As noted, "[i]t is an elementary rule of contract law that there must be mutual assent or a meeting of the minds on all essential elements or terms in order to create a binding contract." *Malani v. Clapp,* 56 Haw. 507, 510, 542 P.2d 1265, 1267 (1975). Accordingly, in order for an arbitration agreement to be valid and enforceable, the parties must have mutually assented to arbitrate their disputes. *Douglass,* 110 Hawai'i at 531, 135 P.3d at 140.

**24.** For the same reason, an agency relationship is not created by the provision in the 2009 Group Agreement providing: "Group is contracting on behalf of the Members (Members are not contracting with Health Plan), but by electing medi-

cal and hospital coverage pursuant to this Service Agreement, or accepting benefits hereunder, Members agree to all terms, conditions and provisions of this Service Agreement."

**25.** In *Leong,* the court did not examine or mention the theory of agency in reaching its determination that the plaintiffs were bound by the arbitration provision. Rather, the court relied on the "undisputed" fact that Kaiser distributed a booklet including notice of the arbitration provision and held that "an averment [by the Leongs] that they did not receive the booklet, without more, is insufficient to negate a provision for binding arbitration contained in the contract." 71 Haw. 240, 246, 788 P.2d 164, 168 (1990). Such an observation would be unnecessary for an agency theory analysis, as all Kaiser members would be bound by the arbitration provision based on their agent's agreement to the provision.

the relevant agreement is not the one between Kaiser and the EUTF, but the agreement of the EUTF employee to enroll in the Kaiser plan. Because the EUTF employee must independently agree to enroll in the Kaiser plan, the EUTF's authority to negotiate the Kaiser plan is not relevant for the purposes of determining whether the employee actually agreed to arbitrate any disputes with Kaiser.

▮ Furthermore, in *Luke*, the court held that a nonsignatory agent's standing to invoke an arbitration agreement under certain circumstances [26] is distinct from the question of whether the arbitration agreement is enforceable. 105 Hawai'i at 249, 96 P.3d at 269. The court explained that while the nonsignatory agent "was entitled to ask the circuit court to enforce the arbitration agreement, ... the circuit court could grant this request only if the Plaintiffs had actually agreed to arbitrate their claims." *Id.* The court noted that "it is axiomatic that there must be an *agreement* to arbitrate in the first instance." *Id.* at 249 n. 12, 96 P.3d at 269 n. 12. In determining whether the plaintiffs actually agreed to arbitrate their claims, the court examined the language of the arbitration agreement and found that the language left the scope of the arbitration agreement "unclear," such that a reasonable person "entering into this contract would not know whether she or he maintained the right to judicial redress or whether she or he had agreed to arbitrate any potential dispute." *Id.* Resolving this ambiguity in favor of the plaintiffs, the court held that the plaintiffs did not agree to submit their claims to arbitration and the circuit court

erred in granting the defendants' request to enforce the arbitration agreement. *Id.*

In this case, there is no dispute that Kaiser has standing to seek to invoke the arbitration agreement against the Siopeses. Thus, the only relevant question is whether the Siopeses agreed to the arbitration clause contained in the Group Agreement. Pursuant to *Luke*, this question of enforceability is distinct from the issue of standing and is not governed by the alternative theory of agency.

### 2. Estoppel

Kaiser argues that Michael is equitably estopped from denying the arbitration agreement because he has "accept[ed] all the benefits of the Group Agreement." Kaiser further contends that "[b]y bringing a breach of contract action against Kaiser, the Siopes[es] are equitably estopped from arguing that [Michael] did not agree to the arbitration provisions contained in that very contract." Kaiser reasons that the Siopeses "cannot present claims for damages based upon alleged violations of certain portions of the Group Agreement, and then claim other portions of the same agreement are not binding and enforceable."

▮ Generally, "estoppel precludes a party from claiming the benefits of a contract while simultaneously attempting to avoid the burdens that contract imposes." *Comer v. Micor, Inc.*, 436 F.3d 1098, 1101 (9th Cir. 2006) (quotation marks omitted). In the context of arbitration, estoppel theory has generated several lines of cases.[27] However, as with the alternative theory of agency, pursuant to *Luke*, estoppel theory is only relevant

---

26. A nonsignatory agent has standing to invoke an arbitration agreement if one of the following two conditions is met:

> First, when the signatory to a written agreement containing an arbitration clause must rely on the terms of the written agreement in asserting its claims against the nonsignatory. Second, when the signatory to the contract containing an arbitration clause raises allegations of substantially interdependent and concerted misconduct by both the nonsignatory and one or more of the signatories to the contract.

105 Hawai'i at 248, 96 P.3d at 268 (quoting *Westmoreland v. Sadoux*, 299 F.3d 462, 467 (5th Cir.2002)).

27. See Rosenhouse, *supra*, at 387, explaining:

> The federal courts have initiated and many state courts have recognized and adopted a unique body of "equitable estoppel" law that is peculiarly applicable to cases in which a nonsignatory to an arbitration agreement either seeks to compel arbitration of a claim against itself brought by a signatory party to the arbitration agreement, or asserts a claim against such a signatory, who then seeks to compel the nonsignatory to arbitrate that claim. The doctrine differs from traditional equitable estoppel in that it contains no requirement of justifiable reliance, and it has not been accepted by all state courts.

(Emphasis added).

to determining whether a party has standing to invoke an arbitration agreement. The enforceability of the arbitration agreement is a separate issue determined through the application of general contract law principles. *Luke*, 105 Hawai'i at 249, 96 P.3d at 269. *See* Rosenhouse, *supra*, at 409 (noting that the doctrine of equitable estoppel "cannot be invoked where the agreement containing the arbitration clause is itself unenforceable"). Given that there is no issue as to whether Kaiser has standing to invoke the arbitration agreement, Kaiser must demonstrate that Michael actually agreed to arbitrate his claims pursuant to the traditional requirements of contract formation.

### 3. Third-party beneficiary

██ Kaiser also argues that Michael is bound by the arbitration provision because he is a third-party beneficiary of the Group Agreement between Kaiser and the EUTF. [AB at 10–11]

██ "A third party beneficiary is one for whose benefit a promise is made in a contract but who is not a party to the contract." *Ass'n of Apartment Owners of New-town Meadows ex rel. Bd. of Directors v. Venture 15, Inc.*, 115 Hawai'i 232, 270, 167 P.3d 225, 263 (2007) (quoting *Pancakes of Haw., Inc. v. Pomare Props. Corp.*, 85 Hawai'i 300, 309, 944 P.2d 97, 106 (App.1997)) (quotation marks omitted) (emphasis added). "Ordinarily, third-party beneficiary status is a question of fact...." *Jou v. Dai–Tokyo Royal State Ins. Co.*, 116 Hawai'i 159, 168, 172 P.3d 471, 480 (2007).

Kaiser argues that the facts of this case demonstrate that Michael was a third-party beneficiary of a contract between Kaiser and the EUTF:

> It is clear that the EUTF intended for Mr. Siopes to benefit from the Group Agreement with Kaiser, that the health benefits to be provided under the Group Agreement were in satisfaction of the EUTF's pre-existing obligation to Siopes to provide his health benefits, and that a material part of the parties' purpose in entering into the Group Agreement was to provide

health benefits to Mr. Siopes under the Kaiser Plan.

(Quotation marks omitted).

However, it is not the case that all State and county employees and retirees, for whom the EUTF manages health care plans, are third-party beneficiaries of all contracts the EUTF negotiates for the purpose of fulfilling its statutory obligation. The employee must select between the different plans presented by the EUTF, and it is only upon enrollment that the employee receives any benefit from the plan negotiated by the EUTF. Thus there is no relationship between the employee and Kaiser until the employee enrolls in a Kaiser plan by signing the Enrollment Form. Once enrollment is completed, the employee and Kaiser are in privity of contract. *See Hunt v. First Ins. Co. of Haw., Ltd.*, 82 Hawai'i 363, 367, 922 P.2d 976, 980 (App. 1996) ("Privity of contract is 'that connection or relationship which exists between two or more contracting parties.'") (brackets omitted) (quoting *Black's Law Dictionary* 1199 (6th ed. 1990)). Therefore, it would be inaccurate to characterize Michael, an enrollee of the Kaiser plan, as a third-party beneficiary of the Group Agreement, given that a third-party beneficiary is by definition not a party to the contract. *See Venture 15*, 115 Hawai'i at 270, 167 P.3d at 263.

Based on the foregoing, the arbitration provision is not binding on Michael based on the theories of agency, estoppel and third-party beneficiary, as those theories are not applicable to the circumstances of this case. In order to enforce the arbitration agreement against the Siopeses, Kaiser must demonstrate that Michael actually agreed to arbitrate his claims with Kaiser when he enrolled in the Kaiser plan.

### C.

As repeatedly emphasized by this court, "[a]rbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he [or she] has not agreed so to submit." *Brown*, 82 Hawai'i at 244, 921 P.2d at 164 (quotation marks and brackets omitted). Thus in order for any arbitration provision to be enforceable, it must meet the requirements of contract for-

mation as articulated in *Douglass*. The parties to the agreement must mutually assent to arbitration, as determined by the terms of the agreement and the surrounding circumstances. *See Douglass*, 110 Hawai'i at 532, 135 P.3d at 141 ("we cannot conclude that, in combination with the surrounding circumstances presented in this case, there is mutual assent"). In this case, the Enrollment Form that Michael signed did not reference the arbitration agreement and the record does not establish that Michael was otherwise informed of the existence of the arbitration agreement, much less that he assented to it. Thus, Kaiser has failed to demonstrate "unambiguous intent to submit to arbitration," and the arbitration provision is unenforceable as between Kaiser and Michael.[28]

### V.

■ Given our conclusion that the arbitration provision contained in the Group Agreement is unenforceable as between Michael and Kaiser, we accordingly hold that Lacey is not bound to arbitrate her claims.[29]

■ However, we note that even if the arbitration agreement was enforceable in this case, Lacey, who is not a Kaiser member and not a party to the Group Agreement, would not be automatically required to submit all of her claims to binding arbitration. As stated, generally only parties to an arbitration agreement may be required to arbitrate their claims. In this case, Lacey did not agree to arbitrate her claims with Kaiser.

In *Brown*, this court undertook an extensive analysis of whether a spouse who was not a signatory to the arbitration agreement could be bound to arbitrate her claims for loss of consortium and negligent and intentional infliction of emotional distress. 82 Hawai'i at 240–43, 921 P.2d at 160–63. In resolving this issue, the court distinguished between a nonsignatory co-plaintiff "asserting contract claims as the *agent* or functional equivalent of a primary plaintiff who is a party to the contract containing an arbitration agreement," and a nonsignatory co-plaintiff "asserting claims that are *distinct and separable* from those of a primary plaintiff who is a party to an arbitration agreement[.]" *Id.* at 242, 921 P.2d at 162.

In the former situation, "[b]ecause recovery as an agent would necessarily be limited to that amount recoverable by the principal, the claimant ... [would] understandably [be] bound by the arbitration agreement that had been signed by the principal." *Id.* at 243, 921 P.2d at 163 (quotation marks omitted). In the latter situation, however, although the claims derive from the same injury, the bases for damages are "totally separate" from the damages that the injured spouse would assert for a claim such as breach of contract. *Id.*

For example, claims for loss of consortium are "derivative in the sense that they do not arise unless one's spouse has sustained a personal injury," but they are "independent and separate" claims for damages. *Id.* at 241, 921 P.2d at 161 (brackets and quotation marks omitted).

Thus, while these types of derivative claims are barred when the victim's initial claim of injury cannot be maintained, and are subject to defenses premised on the injured spouse's contributory or comparative negligence, it does not inevitably follow that they must be adjudicated in the same forum as the claims for injury to

---

28. In *Brown*, this court recognized that "[f]or almost forty years, arbitration agreements have been regarded, as a matter of federal law, as severable and distinct from the underlying agreement." 82 Hawai'i at 245, 921 P.2d at 165. The court held that generally, "an arbitration agreement is severable from the writing in which it is embedded." *Id.* at 246, 921 P.2d at 166. *See Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 445, 126 S.Ct. 1204, 163 L.Ed.2d 1038 (2006) ("as a matter of substantive federal arbitration law, an arbitration provision is severable from the remainder of the contract"); Richard A. Lord, 21 *Williston on Contracts* 245 (4th ed.

2001) ("Ordinarily, an arbitration clause will be treated as a separate contract, and severable from the main body of the contract. Thus, whenever possible, an arbitration clause will be held severable ....") (footnote omitted).

29. Lacey joins in Michael's claims for damages due to breach of contract, medical negligence, insurance bad faith, violations of HRS Chapter 480, and punitive or exemplary damages. Lacey pleads an individual claim for negligent infliction of emotional distress.

which they relate or that they are not otherwise separable.

*Id.* (citations omitted). Accordingly, the *Brown* court held that the nonsignatory spouse's claims for loss of consortium and negligent and intentional infliction of emotional distress were derivative but separable from the signatory's claims, as the claims were asserted "neither as an agent for her husband nor pursuant to a 'derivative' and contract-based theory of recovery, such as that of a third party beneficiary." *Id.* at 243, 921 P.2d at 163. Thus the court held, "to the extent that she is not pursuing claims as [her husband's] agent or under a breach of contract theory (pursuant to which she stands in [her husband's] shoes), [the nonsignatory spouse] is not bound by the arbitration agreement between [the signatory husband] and [his employer]." *Id.*

In this case, the circuit court held that all of Lacey's claims, including her claim for negligent infliction of emotional distress, were subject to arbitration because the Group Agreement "specifically contained language that would specifically encompass claims by non members for harm to members." The circuit court's determination that Lacey was required to arbitrate all of her claims is inconsistent with *Brown*, which considered the derivative and separable nature of the nonsignatory spouse's claims in determining whether the claims were subject to the arbitration agreement.[30] Thus the circuit court erred in not considering the nature of Lacey's claims in determining whether she was bound by the arbitration agreement.

## VI.

The Siopeses also argue that the circuit court was required to consider their claims of unconscionability prior to compelling arbitration.

Unconscionability has generally been recognized to include an absence of meaningful choice on the part of one of the parties together with contract terms which are unreasonably favorable to the other party. Whether a meaningful choice is present in a particular case can only be determined by consideration of all the circumstances surrounding the transaction.

*City & Cnty. of Honolulu v. Midkiff,* 62 Haw. 411, 418, 616 P.2d 213, 218 (1980) (quoting *Williams v. Walker-Thomas Furniture Co.,* 350 F.2d 445, 449 (D.C.Cir.1965)). *See Lewis v. Lewis,* 69 Haw. 497, 502, 748 P.2d 1362, 1366 (1988) (stating "[i]t is apparent that two basic principles are encompassed within the concept of unconscionability, one-sidedness and unfair surprise," and describing "one-sidedness" in the context of premarital agreements to "mean that the agreement leaves a post-divorce economic situation that is unjustly disproportionate"); Restatement (Second) of Contracts § 208 cmt. a (1981) ("The determination that a contract or term is or is not unconscionable is made in the light of its setting, purpose and effect.").

In the context of adhesion contracts, "form contract[s] created by the stronger of the contracting parties" and "offered on a 'take this or nothing' basis," this court has held that such contracts are "unenforceable if two conditions are present: (1) the contract is the result of coercive bargaining between parties of unequal bargaining strength; *and* (2) the contract unfairly limits the obligations and liabilities of, or otherwise unfairly advantages, the stronger party." *Brown,* 82 Hawai'i at 247, 921 P.2d at 167 (citations omitted).

As stated, the circuit court is limited to answering two questions in deciding a motion to compel arbitration: "1) whether an arbitration agreement exists between the parties; and 2) if so, whether the subject matter of the dispute is arbitrable under such agreement." *Koolau Radiology, Inc. v. Queen's Med. Ctr.,* 73 Haw. 433, 445, 834 P.2d 1294, 1300 (1992). Pursuant to HRS § 658A–6(a), an agreement to arbitrate is "valid, enforceable, and irrevocable except upon a ground

---

**30.** The arbitration clause in *Brown* required binding arbitration for "any controversies concerning my compensation, employment[,] or termination of employment ...." 82 Hawai'i at 230, 921 P.2d at 150. In this case, the arbitration provision in the 2009 Group Agreement specifically provides that it applies to "any other person entitled to bring an action for damages for harm to the member ...."

that exists at law or in equity for the revocation of a contract."

Unconscionability is a generally applicable contract defense and is within the scope of the circuit court's review on the question of whether a valid and enforceable agreement to arbitrate exists. *See* Restatement (Second) of Contracts § 208 (1981) ("If a contract or term thereof is unconscionable at the time the contract is made a court may refuse to enforce the contract, or may enforce the remainder of the contract without the unconscionable term...."). *See also Brown,* 82 Hawai'i at 247, 921 P.2d at 167 ("a contract that is 'adhesive' ... is unenforceable if two conditions are present"). In this case, the circuit court granted Kaiser's Motion to Compel Arbitration without addressing whether the arbitration provision in the Group Agreement was unconscionable, based on its determination that the issue was beyond the scope of the court's review.

The Siopeses raised several grounds supporting their claim that the arbitration provision was unconscionable. The Siopeses specifically cited the arbitration agreement's provisions governing fees, discovery, confidentiality and ERISA members as evidence that the arbitration agreement impermissibly advantages Kaiser and limits Kaiser's obligations and potential liabilities.[31] In particular, the Siopeses argued that the arbitration provision's various limitations on civil discovery, including the taking of "brief" depositions of three "critical witnesses," unfairly advantages Kaiser, which has unlimited access to medical records and personnel. Considering that unconscionability is a defense to the enforceability of a contract or contract

provision, the Siopeses raised issues related to the question of whether a valid and enforceable agreement to arbitrate existed in the Group Agreement.

Thus, even if the arbitration provision had met the requirements of contract formation as articulated in *Douglass,* the circuit court should have also addressed whether the provision was unconscionable.[32] The circuit court therefore erred in determining that the Siopeses' claims of unconscionability were beyond the scope of its review in deciding the Motion to Compel Arbitration.[33]

## VII.

Based on the foregoing, we hold that the circuit court erred in ordering the Siopeses to arbitrate their claims against Kaiser. The circuit court's March 5, 2012 orders granting the Motion to Compel Arbitration and Motion to Stay Discovery are therefore vacated, and the case is remanded for proceedings consistent with this opinion.

### Concurring Opinion by ACOBA, J.

I concur in the conclusion of the majority that Petitioners/Plaintiffs–Appellants Michael Siopes (Michael) and Lacey Siopes (Lacey) (collectively Siopeses) were not bound to arbitrate because no binding arbitration agreement existed among the Siopeses and Respondents/Defendants–Appellees Kaiser Foundation Health Plan, Inc., Hawai'i Permanente Medical Group, Inc., and Kaiser Foundation Hospitals, Inc. (collectively, Kaiser). However, I would hold also that the Siopeses cannot be required to arbitrate because they were guaranteed the right to a

31. *See supra* note 10.

32. The 2009 Group Agreement provides, "If the [FAA] or other law applicable to these arbitration terms is deemed to prohibit any term in this Service Agreement in any particular case, then such term(s) shall be severable in that case and the remainder of this Service Agreement shall not be affected thereby." The 2003 Group Agreement provides more generally, "If any term(s) in this Service Agreement is found invalid under applicable law, the validity of the remaining portions ... shall not be affected and the rights and duties hereunder shall be con-

strued and enforced as if this Service Agreement did not contain the term(s) held to be invalid." In light of our disposition of this case, it is unnecessary to address the merits of the unconscionability claims or to resolve whether any provision deemed unconscionable would be severable.

33. Given our determination that the arbitration provision is unenforceable against Michael due to the lack of mutual assent, the circuit court is not required to address the issue of unconscionability on remand.

jury trial under Article I, Section 13 of the Hawaiʻi Constitution,[1] and the Siopeses did not voluntarily, knowingly, and intelligently waive that right.

## I.

### A.

To recount briefly, Michael enrolled in a Kaiser health insurance plan (Kaiser plan) through the Hawaiʻi Employer–Union Health Benefits Trust Fund (EUTF). To subscribe to the Kaiser plan, Michael signed a one-page enrollment form entitled "EUTF Enrollment/Change Form for Active Employees" (Enrollment Form), which Michael signed on May 26, 2003. Michael, who is currently married to Lacey, indicated that he was "Single" on the Enrollment Form. On the Enrollment Form, Michael signed a provision indicating that he agreed to "abide by the terms and conditions of the benefit plans [he] selected." The Enrollment Form neither defined the "terms and conditions" of

the Kaiser plan nor explained where those terms were located.

Kaiser asserts that at the time Michael signed the EUTF, the Kaiser plan was governed by the 2003 Group Medical and Hospital Service Agreement (Group Agreement). Included in the Group Agreement is a section governing arbitration (Section 8 or arbitration clause). Under Section 8, "[a]ny claim arising from an alleged violation of a legal duty incident to this Service Agreement" brought by a "Member"[2] against a Kaiser entity is subject to "binding arbitration."[3] Section 8 further provides that Members "waive their rights to jury or court trial." Nothing in the record indicates that Michael was aware of the Group Agreement or its arbitration provisions, either before or after he signed the EUTF. To the contrary, Michael stated in a declaration that "[p]rior to signing the Enrollment Form, [he did] not recall being provided a copy of the Group Service Agreement or any other documentation."

---

**1.** Article I, Section 13 of the Hawaiʻi Constitution provides as follows:

> In suits at common law where the value in controversy shall exceed five thousand dollars, <u>the right of trial by jury shall be preserved.</u> The legislature may provide for a verdict by not less than three-fourths of the members of the jury.

(Emphasis added.)

**2.** The Group Agreement defines a "Member" as "Any Subscriber or Family Dependent."

**3.** Section 8 provides in relevant part as follows:

> B. Binding Arbitration. <u>Any claim arising from an alleged violation of a legal duty incident to this Service Agreement shall be submitted by the Member to binding arbitration if the claim is asserted:</u>
> (1) By a Member or the personal representative of the Member's estate, or by any other person entitled to bring an action for damages for harm to the Member as permitted by Hawaiʻi state law existing at the time the claim is filed ("Claimant");
> (2) On account of death, bodily injury, physical ailment, mental disturbance, or economic loss arising out of the rendering or failure to render services or the provision or failure to provide benefits under this Service Agreement,

or arising out of any other claim, irrespective of the legal theory upon which the claim is asserted;
> (3) For monetary damages exceeding the jurisdictional limit of the Small Claims Division of the District Court of the State of Hawaiʻi for claims (other than counterclaims); and
> (4) Against one or more of the following entities or their employees, officers or directors ("Respondent"):
> (I) Kaiser Foundation Health Plan, Inc.,
> (ii) Kaiser Foundation Hospitals,
> (iii) Hawaiʻi Permanente Medical Group, Inc.,
> (iv) The Permanente Federation, LLC,
> (v) The Permanente Company, LLC,
> (vi) Any individual or organization that contracts with an organization named in (i), (ii), (iii), (iv) or (v) above to provide services to Health Plan Members, when such contract includes a provision requiring arbitration of a claim of a Health Plan Member.
>
> . . .
> <u>The arbitration award shall be final and binding. The Respondents and Members waive their rights to jury or court trial.</u> With respect to any matter not expressly provided for herein, the arbitration shall be governed by Hawaiʻi Revised Statutes Chapter 658.

(Emphases added.)

## B.

In their Complaint, the Siopeses alleged that on February 16, 2010, it was determined that an ulcerated cancer tumor was located at the junction of Michael's esophagus and stomach. Kaiser physicians admitted that they did not have expertise with this type of cancer, and initially misdiagnosed Michael's condition as requiring an invasive surgery that would have left Michael "severely disfigured and disabled for the rest of his life."

The Siopeses sought a second opinion from Duke University Medical Center ("Duke"). Specialists at Duke correctly diagnosed Michael's cancer and recommended a course of treatment that was eventually successful. Two Kaiser physicians provided a referral for Michael's treatment at Duke, and Michael's personal physician requested that Michael's treatment be covered by the Kaiser plan. Nevertheless, Kaiser declined to cover the expense of Michael's treatment at Duke.

Based on the foregoing, the Siopeses filed suit against Kaiser on November 9, 2011. On the same day, the Siopeses filed a Demand For Jury Trial. On January 12, 2012, Kaiser filed a Motion to Compel Arbitration. The Siopeses filed an opposition memorandum, asserting, *inter alia,* that the Siopeses had not "waived [their] Constitutional right to a jury trial." Kaiser filed a reply but did not respond to the Siopeses' jury trial assertion. On March 5, 2012, the court issued an Order Granting the Defendant's Motion to Compel Arbitration, apparently reasoning that the Siopeses were bound by the arbitration clause of the Group Agreement under *Leong v. Kaiser Foundation Hospital,* 71 Haw. 240, 788 P.2d 164 (1990).[4] The court's order did not respond to the Siopeses' claim that they were denied their right to a jury trial.

## II.

The right to a jury trial in civil cases is guaranteed by Article I, Section 13 of the Hawai'i Constitution, which mandates that "[i]n suits at common law where the value in controversy shall exceed five thousand dollars,[5] the right of trial by jury shall be preserved[.]" (Emphasis added.) The right to a jury trial is further protected by HRS § 635–13, which states that "[w]hen the right of trial by jury is given by the Constitution ... and the right has not been waived, the case shall be tried with a jury[.]" (Emphasis added.) Hawai'i Rules of Civil Procedure (HRCP) Rule 38, provides that "[t]he right of trial by jury as given by the Constitution ... shall be preserved to the parties inviolate." (Emphasis added.) It has been explained that "given [its] recognition by two branches of the Hawai'i state government, as well as both the Hawai'i and United States Constitutions, the right to a jury trial in civil cases is clearly among the most sacred, fundamental rights enjoyed by our citizens." *Pancakes of Hawai'i, Inc. v. Pomare Properties Corp.,* 85 Hawai'i 300, 944 P.2d 97 (App.1997).

" 'The constitutional right to a jury trial in civil cases ... is capable of being waived.' " *Lii v. Sida of Hawai'i, Inc.,* 53 Haw. 353, 355, 493 P.2d 1032, 1033 (1972) (quoting *Seong v. Trans–Pacific Airlines, Ltd.,* 41 Haw. 231, 240 (1955)). Such a waiver may occur when contracting parties waive the right to a jury trial. *See Joy A. McElroy, M.D., Inc. v. Maryl Group, Inc.,* 107 Hawai'i 423, 430–31, 114 P.3d 929, 936–37 (App.2005) (holding that the plaintiff waived his right to a jury trial by signing a contract with an unambiguous waiver); *see also K.M.C. Co., Inc. v. Irving Trust Co.,* 757 F.2d 752, 755 (6th Cir.1985) ("It is clear that the parties to a contract may by prior written agreement

---

4. In *Leong,* this court held that plaintiffs were bound to arbitrate under the terms and conditions of a Kaiser health insurance plan even though the terms and conditions did not contain an arbitration provision at the time they enrolled in the plan, and the plaintiffs arguably did not receive a copy of the changed terms and conditions of the plan. 71 Haw. at 245–46, 788 P.2d at 168. However, in *Leong* the plaintiffs did not assert that they were denied their right to a jury trial under the Hawai'i Constitution, and therefore that issue was not before this court.

5. The Siopeses estimate that they "incurred over $250,000 in medical expenses at Duke."

waive the right to jury trial.").[6] Nevertheless, " '[t]he right to a jury trial is inviolate in the absence of an unequivocal and clear showing of a waiver[.]' " *Mehau v. Reed,* 76 Hawai'i 101, 110, 869 P.2d 1320, 1329 (1994) (quoting *Lii,* 53 Haw. at 355, 493 P.2d at 1034).

Moreover, any contractual waiver of the right to a jury trial must be voluntary, knowing, and intelligent.[7] *See K.M.C. Co.,* 757 F.2d at 756 ("Those cases in which the validity of a contractual waiver of jury trial has been in issue have overwhelmingly applied the knowing and voluntary standard."); *Nat'l Equip. Rental, Ltd. v. Hendrix,* 565 F.2d 255, 258 (2d Cir.1977) ("It is elementary that the Seventh Amendment right to a jury is fundamental and that its protection can only be relinquished knowingly and intentionally."). This standard is consistent with the general rule that "[c]onstitutional rights may ordinarily be waived by clear and convincing evidence that the waiver is voluntary, knowing, and intelligent." *Brown v. Thompson,* 91 Hawai'i 1, 10 n. 9, 979 P.2d 586, 595 n. 9 (1999). Inasmuch as the right of a civil jury trial is embedded in the Hawai'i Constitution, that right may only be contractually waived if done so voluntarily, knowingly, and intentionally.[8]

Finally, the right to a trial by jury is a personal constitutional right. *See Pancakes Hawai'i,* 85 Hawai'i at 305, 944 P.2d at 102 (describing the right to a jury trial in civil cases as a "fundamental right enjoyed by our citizens") (emphasis added); *see also* HRCP Rule 38 (mandating that the right to trial by jury "shall be preserved to the parties") (emphasis added); *cf. Commodity Futures Trading Com'n v. Schor,* 478 U.S. 833, 848–49, 106 S.Ct. 3245, 92 L.Ed.2d 675 (1986) (listing the right to trial by jury in civil cases as a "personal constitutional right"); *Barzellone v. Presley,* 126 P.3d 588, 601 (Okla.2005) ("The constitutional right to a jury trial [in civil cases] is a personal right[.]"). Hence, it can be waived only by the individual holding the right. *See Scott v. Neely,* 140 U.S. 106, 109–10, 11 S.Ct. 712, 35 L.Ed. 358 (1891) (stating that the right to trial by jury in a civil case "cannot be dispensed with, except by the assent of the parties entitled to it") (emphasis added); *cf. Domingo v. State,* 76 Hawai'i 237, 241, 873 P.2d 775, 780 (1994) (emphasis added) ("[T]he right to a trial by jury is a personal right that cannot be waived by anyone other than the defendant[.]"); *State v. Young,* 73 Haw. 217, 221, 830 P.2d 512, 515 (1992) ("[W]aiver of a fundamental right such as the right to jury trial must be through the personal action of the beneficiary of that right.") (emphasis added); *Palmer v. Valdez,* 560 F.3d 965, 969 (9th Cir.2009) (noting than "[a]n individual may waive his or her right to a civil jury trial") (emphasis added).

## III.

The Siopeses indicated their intent to avail themselves of the right to a jury trial by filing a demand for jury trial along with the complaint. However, the court denied the Siopeses this right by concluding that they were bound by the terms of the arbitration

---

**6.** This court has said that "[b]ecause article I, section 13 was patterned after the seventh amendment to the United States Constitution, we have deemed the interpretation of [the seventh amendment] by the federal courts highly persuasive in construing the right to a civil jury trial in Hawai'i." *Hous. Fin. & Dev. Corp. v. Ferguson,* 91 Hawai'i 81, 87, 979 P.2d 1107, 1113 (1999) (internal punctuation and quotation marks omitted).

**7.** HRCP Rule 38 provides that a party may waive his or her right to a jury trial in a civil case by failing to make a timely demand, i.e. by "mere inadvertence." *K.M.C. Co.,* 757 F.2d at 756 n. 4. However, this does not preclude the application of the voluntary, knowing, and intelligent standard to a contractual waiver of the right to a jury trial. As explained by the Sixth Circuit with regard to the analogous Federal Rules of Civil Procedure Rule 38, "there is a sound rationale underlying the application of different standards in the two instances." *Id.* "[T]he rule respecting timely demand for trial by jury is a reasonable requirement calculated to insure the orderly presentation of the business of the court." *Id.* Such concerns are not present in the context of the contractual waiver of the right. *See id.*

**8.** Regarding the right to a jury in criminal cases, this court has held that "[t]he right to trial by jury may be effectively waived only when the accused has acted voluntarily and knowingly." *See, e.g., State v. Olivera,* 53 Haw. 551, 553, 497 P.2d 1360, 1361 (1972) *overruled on other grounds by State v. Young,* 73 Haw. 217, 830 P.2d 512 (1992).

clause in the group agreement.[9] Under the arbitration clause, the Siopeses are required to submit to "final and binding arbitration." Under the court's ruling, the Siopeses could not later present their case to a jury. Instead, their case would be decided by "a panel of three arbitrators." *Cf. Badie v. Bank of America*, 67 Cal.App.4th 779, 804, 79 Cal.Rptr.2d 273 (1998) (noting that enforcing an arbitration agreement against the plaintiffs would "amount to waiver of their constitutionally based right to a jury trial").

It is evident that neither Michael nor Lacey voluntarily, knowingly, and intelligently waived their right to a jury trial. The Enrollment Form signed by Michael stated only that he agreed to the "terms and conditions" of the Kaiser plan. Nothing in the Enrollment Form referred to either the Group Agreement or the arbitration clause. Michael was not informed that the "terms and conditions" of the Kaiser plan were contained in the Group Agreement, nor was he provided with a copy of the Group Agreement before he signed the Enrollment Form. Nothing indicated to Michael that by enrolling in the Kaiser plan he was agreeing to waive his right to a jury trial. In other words, Michael <u>could not have</u> expressly relinquished his jury right under the Hawai'i Constitution in the absence of evidence that he had voluntarily, knowingly, and intelligently given up that right.[10]

Kaiser does not contend that Michael personally waived his right to a jury trial.[11] At oral argument, however, Kaiser relied on

*Madden v. Kaiser Foundation Hospitals*, 17 Cal.3d 699, 131 Cal.Rptr. 882, 552 P.2d 1178 (1976) for the proposition that the EUTF "could, as an agent for its employee beneficiaries, waive the right to a jury trial." Oral Argument at 46:50, Siopes v. Kaiser Found. Health Plan, Inc., No. SCAP–12–0000361, *available at* http://state.hi.us/jud/oa/13/ SCOA_051613_12361.mp3.

However, first, *Madden* did not expressly conclude that an agent could waive the right to a jury trial on behalf of its employee beneficiaries. Instead, the California Supreme Court only discussed the constitutional right to a jury trial in the context of its holding that "arbitration provisions without express mention of any right to jury trial" may be upheld. *Madden*, 131 Cal.Rptr. 882, 552 P.2d at 1187. Indeed, the California Supreme Court's reasoning appeared to assume that the parties themselves would sign the arbitration provision. *See id.* ("When <u>parties agree</u> to submit their disputes to arbitration they select a forum ... in which, as they well know, disputes are not resolved by juries.") (emphasis added).[12]

In any event, as explained *supra*, the right to a jury trial is a personal constitutional right that "cannot be dispensed with, <u>except by the assent of the parties entitled to it.</u>" *Scott*, 140 U.S. at 109–10, 11 S.Ct. 712 (emphasis added). To the extent that *Madden* conflicts with this basic rule inherent in all

---

**9.** The Siopeses raised the argument that they did not waive their right to a jury trial both before the court and on appeal. Before the court, the Siopeses pointed out that the clause in the Enrollment Form signed by Michael was "devoid of any language suggesting that he had agreed to binding arbitration or waived his Constitutional right to a jury trial[.]" In their Opening Brief before this court, the Siopeses further stated that "[t]he [court] determined that Michael Siopes had waived his right to a jury trial ... based upon an arbitration provision that [he] had never seen or otherwise assented to." The Siopeses further argued that the court erroneously bound Lacey to the same provision.

**10.** In the context of contracts that do not contain an agreement to arbitrate, federal courts have rejected provisions waiving the right to a jury trial on similar grounds. *See, e.g., Hendrix*, 565 F.2d at 258 (finding that a contractual waiver of the right to a jury trial was not knowing and voluntary because, *inter alia*, "[t]he waiver clause was set deeply and inconspicuously in the con-

tract"); *Dreiling v. Peugeot Motors of America, Inc.*, 539 F.Supp., 402, 403 (D.Colo.1982) (holding that waiver was not voluntary, knowing, or intelligent because, *inter alia*, there was no evidence that the provision was "even brought to the plaintiff's attention"); *cf. K.M.C. Co.*, 757 F.2d at 757 (holding that a contractual waiver of the right to a jury trial was not knowing and voluntary because the party signing the contract was told "that the jury waiver provision would not be enforced").

**11.** Kaiser did not discuss the Siopeses' right to a jury trial either before the court or in its briefs on appeal.

**12.** Moreover, California law now requires that "[a]ny health care service plan that includes terms that require binding arbitration ... and that restrict, or provide for a waiver of, the right to a jury trial" must include a disclosure "prominently displayed on the enrollment form" that "clearly state[s] whether the ... enrollee is waiv-

464

fundamental rights, *cf. Young*, 73 Haw. at 221, 830 P.2d at 515, it does not represent persuasive authority. Hence, irrespective of *Madden*, it is well established that the right to trial by jury can be waived only by the party entitled to it. Here, nothing in the record indicates that Michael personally waived this right. Thus, under the circumstances, Michael did not voluntarily, knowingly, or intelligently waive his right to a jury trial by signing the arbitration agreement.

Additionally, nothing in the record indicates that Lacey waived her right to a jury trial. Lacey did not sign any form indicating that she was subject to the conditions of the Kaiser plan, nor did she indicate her assent to the Group Agreement in any way. Thus, there is no basis in the record for concluding that Lacey voluntarily, knowingly, or intelligently waived her right to a jury trial.

In sum, in requiring the Siopeses to submit to arbitration, the court erroneously denied them the right to a jury trial granted by Article I, Section 13 of the Hawai'i Constitution, and thereby extinguished that right. However, because the Siopeses have not waived that right, the court's order must be vacated and the case remanded for a trial by jury.[13] *Mehau*, 76 Hawai'i at 110, 869 P.2d at 1329 (holding that the right to a jury trial is "inviolate" absent waiver).

Concurring Opinion by McKENNA, J.

I concur in the result, and also with Justice Acoba's concurring opinion that there was no valid waiver of the Siopeses' right to jury trial under Article I, Section 13 of the Hawai'i Constitution.

I write separately, however, because respectfully, I do not believe *Leong v. Kaiser Found. Hosps.*, 71 Haw. 240, 788 P.2d 164 (1990) is distinguishable. Rather, I believe *Leong* should be overruled based on the lack of mutual assent to the arbitration agreement exhibited by the facts of that case, pursuant to this court's later holding in *Brown v. KFC Nat'l Mgmt. Co.*, 82 Hawai'i 226, 921 P.2d 146 (1996).

ing his or her right to a jury trial." Cal. Health & Safety Code § 1363.1 (West 2013). The purpose of this provision "is to protect health care consumers from the consequences of unknowingly waiving their right to a jury trial." *Rodriguez v. Blue Cross of California*, 162 Cal.App.4th 330, 332, 75 Cal.Rptr.3d 754 (2008) (internal quotation marks omitted). Any arbitration agreement is unenforceable if the corresponding enrollment form does not comply with these statutory provisions. *Zembsch v. Superior Court*, 146 Cal.App.4th 153, 168, 53 Cal.Rptr.3d 69 (2006). Hence, California now effectively requires enrollees to personally waive their right to a jury trial.

**13.** Section 2 of the Federal Arbitration Act (FAA) provides that agreements to arbitrate are "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2 (emphasis added). Section 2 "permits agreements to arbitrate to be invalidated by generally applicable contract defenses," but "not by defenses that apply only to arbitration or derive their meaning from the fact that an agreement to arbitrate is at issue." *AT&T Mobility v. Concepcion*, — U.S. —, 131 S.Ct. 1740, 1746, 179 L.Ed.2d 742 (2011) (internal quotation marks removed). In other words, a court may not "rely on the uniqueness of an agreement to arbitrate" to invalidate an arbitration agreement. *Id.* at 1747. Further, a generally applicable rule is preempted if it "interferes with the fundamental attributes of arbitration." *Id.* at 1748.

In *Concepcion*, the Supreme Court voided a California rule invalidating, as unconscionable, contracts prohibiting class actions. *Id.* at 1750. The Court reasoned that the California rule "interferes with arbitration" because class arbitration is "slower, more costly, and more likely to generate procedural morass," "requires procedural formality," and "greatly increases risks to defendants." *Id.* at 1751. Therefore, the California rule was preempted by the FAA. *Id.* at 1753. However, the Court noted that "States remain free to take steps addressing the concerns that attend contracts of adhesion" by, for example "requiring class-action-waiver provisions in adhesive arbitration agreements to be highlighted." *Id.* at 1750 n. 6 (emphasis added).

The requirement that a party voluntarily, knowingly, and intentionally waive the right to a jury trial applies equally to every contractual waiver of that right, and does not "rely on the uniqueness of an agreement to arbitrate." Indeed, the same requirement has been applied by the federal courts to contracts that do not contain an arbitration provision on numerous occasions. *See supra* note 10. Further, this requirement does not interfere with "the fundamental attributes of an agreement to arbitrate." Unlike the rule at issue in *Concepcion*, the requirement that parties to a contract voluntarily, knowingly, or intelligently waive their right to a jury trial does not interfere with the procedural aspects of arbitration. Instead, the requirement that parties who waive their right to a jury trial do so voluntarily, knowingly, and intentionally is similar to the requirement that certain provisions of an arbitration agreement be highlighted, which *Concepcion* expressly approved.